Rodney Connolly was charged in a two-count indictment with the capital offenses of murder during the commission of a robbery and murder for hire. Alabama Code 1975, §§13A-5-40(a)(2) and (7). At trial, the trial court granted Connolly's motion to exclude as to count two charging murder for hire, finding that the State had not presented any evidence to support that charge. The jury found Connolly "guilty of the capital offense as charged in the indictment" and recommended a sentence of life without parole. Following this recommendation, the trial court sentenced Connolly to life without parole. Three issues are raised on this appeal.
 I
Connolly argues that the trial court erred in permitting Attorney Al Pennington to testify against him over his objection of attorney-client privilege.
Jack Herriman II was Connolly's accomplice in the murder of Kathy Jo Sands. Before Connolly was tried, Herriman was separately tried and convicted for the capital murder of Ms. Sands. Herriman's retained attorney, both at trial and on appeal, was Al Pennington.
After Herriman was convicted, Connolly was indicted for the capital murder of Ms. Sands. Connolly had been previously convicted *Page 59 
for the theft of Ms. Sands' automobile.
In May of 1984, Attorneys Reynolds Alonzo and Wilson Hawkins were appointed to represent Connolly on the capital charges. In July of 1984, Connolly retained attorneys Robert Clark and Jeff Deen. These two attorneys represented Connolly at trial.
While incarcerated in the Mobile County Jail awaiting trial, Connolly had some "grievances" about jail conditions and also "some complaints or some questions" about one of his attorneys. Connolly spoke with Fritz Nahrgang, a minister with a prison fellowship group who frequented the jail. Nahrgang suggested that he contact the "jail monitor" concerning his grievances. At that time, one of the "jail monitors" was Al Pennington.
Nahrgang contacted Pennington and told him that Connolly wanted to talk to him. Connolly telephoned Pennington several days later. As a result of their conversation, Pennington and his law partner, Dan McCleave, went to the jail and spoke to Connolly.
Pennington testified that Connolly told him that "he [not Herriman] was the one who went through, rifled the purse and took . . . a money machine card and whatever was taken out of her purse." Connolly also told Pennington that "he and Stacey Brunner discussed getting rid of Kathy Sands," and that "he sort of felt responsible for Kathy Sands being dead." Connolly stated "that Jack Herriman was a whimp [sic] and that he could pretty much get Jack to do whatever he wanted him to do."
Pennington used the information he obtained from Connolly in an attempt to extract certain post-conviction "concessions" from the District Attorney for Herriman. However, no deal was ever reached.
The State subpoenaed Pennington to testify at Connolly's trial to the substance of his conversation with Connolly at the Mobile County Jail. Pennington moved to quash the subpoena, asserting "work-product" and "attorney-client privilege" as grounds for the motion. Connolly's attorney also objected to the State's attempt to elicit Pennington's testimony.
The trial court denied both Pennington's and Connolly's motions. Pennington sought review of the ruling by "Petition for Writ of Prohibition" in this Court alleging "work product" and "attorney-client privilege" as grounds for issuance of the writ. The petition was denied without opinion in Ex partePennington, 461 So.2d 60 (Ala.Cr.App. 1984), cert. denied,459 So.2d 1017 (Ala. 1984).
Connolly now contends that the trial court erred in permitting or ordering Pennington's testimony alleging a violation of the attorney-client privilege.
The attorney-client privilege is statutorily defined at §12-21-161, Code of Alabama 1975:
 "No attorney or his clerk shall be competent or compelled to testify in any court in this state for or against the client as to any matter or thing, knowledge of which may have been acquired from the client, or as to advice or counsel to the client given by virtue of the relation as attorney or given by reason of anticipated employment as attorney unless called to testify by the client, but shall be competent to testify, for or against the client, as to any matter or thing the knowledge of which may have been acquired in any other manner."
The basic elements of this privilege have been stated by Dean Wigmore in the following manner:
 "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived." C. Gamble, McElroy's Alabama Evidence § 388.01 (3d ed. 1977).
The burden of establishing the privilege rests with the client or the party objecting to the disclosure of the communication. *Page 60 
 "The burden of showing the confidential character of a communication rests on the party objecting to the introduction of evidence. This party must establish the relationship of attorney and client as well as other facts demonstrating the claim of privileged information. See Harris v. State, 281 Ala. 622, 206 So.2d 868 (1968). The client must also show that the admission of this privileged information into evidence will be prejudicial to the client. See Rowland Co. v. Plummer, 50 Ala. 182
(1874). Because, however, invocation of this privilege is solely the client's prerogative, the privilege may be waived, either directly or constructively, by the client. See Rowland Co., supra." Swain v. Terry, 454 So.2d 948, 953-54
(Ala. 1984).
" 'Whether a communication by a client to his attorney is privileged is a question of fact to be determined by the court. A witness, be he attorney or client, is not entitled to decide the question for himself.' " Harris v. State, 281 Ala. 622,625, 206 So.2d 868, 871 (1968), quoting, Ex parte Griffith,278 Ala. 344, 350, 178 So.2d 169, 176 (1965), cert. denied,382 U.S. 988, 86 S.Ct. 548, 15 L.Ed.2d 475 (1966).
At the pretrial hearing on this issue, Connolly testified that, while in the Mobile County Jail, he had some "complaints" about jail conditions and "questions" about one of his attorneys. He asked Nahrgang about securing legal assistance. Nahrgang suggested that Connolly talk to one of the "jail monitors". Nahrgang told Connolly that Al Pennington worked in such a capacity and Connolly requested that Nahrgang contact Pennington on his behalf. Connolly himself later called Pennington from the jail. Pennington and his law partner went to the jail and spoke to Connolly. Connolly contended that he "address[ed] Pennington in his capacity as an attorney." He "assumed" that the conversation would be confidential. Connolly's stated purpose in contacting Pennington was "to secure an opinion and to discuss the possibility of legal services."
Connolly acknowledged on cross examination that Pennington told him that he represented Herriman, but denied that Pennington told him that he could not also represent him.
Al Pennington testified that, at the time Connolly contacted him, he was employed by Mobile County as a "jail monitor". In this capacity, Pennington was "[t]o advise . . . the Circuit Court and District Court judges concerning bonds of people who had been in jail for long periods of time in what appeared to be bondable offenses."
Pennington stated that he was contacted by Nahrgang and informed that Connolly wanted to talk to him, but Nahrgang did not say what Connolly wanted to talk about. Pennington refused to speak to Connolly unless Connolly made direct contact with him and requested such a meeting. Pennington testified at a suppression hearing conducted during the trial that, "I told Mr. Nahrgang that I would not just go and see Rodney Connolly on his word. But that if Mr. Connolly wanted to contact me that he should do so, and then I would come see him." Connolly telephoned Pennington a few days later and Pennington and his law partner, Dan McCleave, went to the county jail and spoke to Connolly.
Connolly informed Pennington of "one grievance," but they got into "conversation about other things as well." Connolly's "complaint . . . didn't have anything to do with bond."
Pennington stated that he advised Connolly at the very beginning of their conversation that he represented Jack Herriman and was still representing him on appeal. Pennington told Connolly, "that any part of our conversation that concerned Mr. Herriman would be used by me for the benefit of Mr. Herriman and Mr. Herriman only," and that he "could only represent Jack Herriman." Pennington could not recall telling Connolly that he could not represent him on any matter, just not "anything that involved Jack Herriman." Pennington testified that Connolly never asked him to represent him as a lawyer. *Page 61 
Under these facts and circumstances, we find that the trial court did not err in compelling Pennington to testify at Connolly's trial.
The question of whether the communication was privileged was a question of fact for the court to resolve, Harris v. State, supra, especially considering the conflicting testimony of Connolly and Pennington. While Connolly testified that he assumed his conversation with Pennington was "confidential," Pennington testified that he told Connolly that he would use any information obtained during the course of their conversation to benefit Herriman. Connolly maintained that Pennington never told him that he could not represent him. Yet, Pennington testified that he told Connolly that he "could only represent Herriman." Although Connolly stated that he discussed with Pennington the "possibility of legal services," Pennington stated that Connolly never asked him to "represent him as a lawyer."
In light of the foregoing, there is ample testimony to support the trial court's ruling that no attorney-client privilege existed. Consequently, the trial court did not abuse its discretion in compelling Pennington to testify. As we said in Rogers v. State, 417 So.2d 241, 248 (Ala.Cr.App. 1982), "[t]he determination of the competency of a witness is within the sound discretion of the trial court, and such discretion is of a well nigh irrevisable nature."
At trial, Connolly moved to suppress the statements made by him to Pennington on the grounds that Pennington was an "official" of the State by virtue of his employment as a "jail monitor" and, therefore, the burden was on the State to prove that the statements were voluntarily made and Miranda warnings given. Alternately, Connolly argued that, at the time of their conversation, Pennington was an agent of the district attorney's office. The motion was denied. We find these arguments without merit.
"According to Terry v. State, 397 So.2d 217
(Ala.Cr.App. 1981), Miranda warnings are not required in instances where inculpatory or otherwise admissible statements are made to persons who are not law enforcement officers or their agents." Warrick v. State, 460 So.2d 320, 323
(Ala.Cr.App. 1984). See also Traylor v. State, 439 So.2d 178,180-81 (Ala.Cr.App. 1983).
In testifying as to his duties and responsibilities as a "jail monitor" for Mobile County, Pennington stated:
 "I was appointed by Judge Hodnette to assist the County in determining who was in the jail on bondable offenses that had not been able to make bond for whatever reason, too high a bond or too severe surety requirements, and to determine whether or not those people were in jail on cases that would — should be reviewed to determine if the bonds ought to be reduced or conditions of bond reduced so that they might make bond and get out of jail to reduce the jail population."
Pennington testified that he did not go to the jail to see Connolly as a result of his employment by the county, and that their conversation didn't have "anything to do with bond."
Even if Pennington's conversation with Connolly was connected to his employment as a "jail monitor," we do not find that Pennington's performance of the duties and responsibilities mentioned above transformed him into a "law enforcement officer." By definition, a "law enforcement officer" is a person "whose duty it is to preserve the peace." Black's LawDictionary 796 (5th ed. 1979). By contrast, Pennington's duty was to reduce the jail population. He was in no way connected with the criminal investigation process. See 2 W. Ringel,Searches Seizures, Arrests and Confessions § 26.5 (1979).
Connolly asserts that, since Pennington was engaged in obtaining information from Connolly for use by the State, he was an agent of the district attorney's office. At the time of his conversation with Connolly, Pennington was engaged in post-conviction "plea bargaining" negotiations on behalf of Herriman with the district attorney's office. *Page 62 
Although Pennington did not "think" he told Connolly at the time of their conversation that he was negotiating a deal with the State, he did tell Connolly that whatever he told him would be used to benefit Herriman.
The testimony simply fails to disclose any inference that Pennington was an agent of the State. There was no evidence tending to show that the district attorney's office ever possessed a "right of control" over Pennington. Absent such a "right of control," an agency relationship cannot exist. Exparte Wilson, 408 So.2d 94, 97 (Ala. 1981); National SecurityFire Casualty Co. v. Bowen, 447 So.2d 133, 137 (Ala. 1983). Pennington was merely taking advantage of Connolly's invitation and acting as diligent and effective defense counsel for Herriman in obtaining information from Connolly about Ms. Sands' murder — a fact of which he clearly informed Connolly.
 II
Connolly contends that the evidence is insufficient to support his conviction for the capital offense of murder during the commission of a robbery under § 13A-5-40(a)(2), Code of Alabama 1975, because there is no evidence of an intent to commit a robbery at the time Ms. Sands was killed and the taking of the property was only an "afterthought".
An "impressive majority" of jurisdictions which have considered this question in the context of a felony-murder charge have "concluded that an accused is not guilty of a felony-murder where he forms felonious intent only after he commits the killing." Commonwealth v. Spallone, 267 Pa. Super. 486,489, 406 A.2d 1146, 1147 (1979), citing United States v.Bolden, 169 U.S.App.D.C. 60, 514 F.2d 1301 (1975); UnitedStates v. Mack, 151 U.S.App.D.C. 162, 466 F.2d 333, cert. denied, 409 U.S. 952, 93 S.Ct. 297, 34 L.Ed.2d 223 (1972); Longv. United States, 364 A.2d 1174 (D.C.Ct.App. 1976); People v.Gonzales, 66 Cal.2d 482, 58 Cal.Rptr. 361, 426 P.2d 929
(1967); State v. Snow, 383 A.2d 1385 (Me. 1978); State v.Montgomery, 191 Neb. 470, 215 N.W.2d 881 (1974)(semble); Peoplev. Joyner, 26 N.Y.2d 106, 308 N.Y.S.2d 840, 257 N.E.2d 26
(1970); accord, LaFave and Scott, Criminal Law, supra, § 71 at 558; Note, 42 Dick.L.Rev. 85 (1938). See also O'Pry v. State,642 S.W.2d 748, 761-62 (Tex.Cr.App. 1981) ("proof of a robbery committed as an 'afterthought' and unrelated to a murder" is insufficient to show that a defendant committed the murder during the course of committing a robbery).
Although, in a prosecution for a capital offense, the felony-murder doctrine has no place in securing a conviction of the offense charged, Alabama Code 1975, § 13A-5-40(c); Ex parteRitter, 375 So.2d 270, 273-75 (Ala. 1979), vacated on other grounds, Ritter v. Alabama, 448 U.S. 903, 100 S.Ct. 3044,65 L.Ed.2d 1133 (1980), this same principle is applicable in a capital case — an accused is not guilty of capital robbery-murder where the intent to rob was formed only after the victim was killed. Beverly v. State, 439 So.2d 758
(Ala.Cr.App. 1983).
To sustain a conviction under § 13A-5-40(a)(2) for capital murder-robbery, the State must prove beyond a reasonable doubt: (1) a "robbery in the first degree or an attempt thereof," as defined by § 13A-8-41, (2) a "murder" as defined by §13A-6-2(a)(1), and (3) that the murder was committed "during" the robbery or attempted robbery, i.e. that the murder was committed "in the course of or in connection with the commission of, or in immediate flight from the commission of" the robbery or attempted robbery in the first degree. §13A-5-39(2).
This issue was addressed in Bufford v. State, 382 So.2d 1162
(Ala.Cr.App.) cert. denied, 382 So.2d 1175 (Ala. 1980). Bufford was a state prisoner incarcerated in the county jail and was classified as being on "work-release" status. On the morning of April 30, 1977, Bufford was released into the custody of Roland Cooper, the victim, to perform minor gardening chores. Late that evening, the victim's body was found in a wooded area, " 'face down with his *Page 63 
hands tied behind him.' " The victim's empty wallet was found some distance from the body. The testimony established that Cooper usually carried between $150 and $200 in his billfold. Cooper's automobile was also missing. 382 So.2d at 1165.
Bufford challenged the sufficiency of the evidence to prove that the intentional killing occurred during the course of a robbery. In his confession, Bufford admitted killing Cooper in anger because the victim verbally abused him. However, Bufford contended that it was not until after the killing that he thought of taking the victim's wallet and car and fleeing. 382 So.2d at 1170.
In Bufford, this Court found that, "[t]he jury could have reasonably inferred from the circumstances of the case that the appellant decided to rob and kill the victim and to use his vehicle and money to escape." 382 So.2d at 1170. Thus, there was sufficient evidence presented to support "the jury's conclusion that this was not merely a killing in the heat of anger followed by a larceny of the wallet and vehicle as a mereafterthought." 382 So.2d at 1170-71 (emphasis added).
As the Alabama Supreme Court held in Cobern v. State,273 Ala. 547, 142 So.2d 869 (1962), "the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events."Clements v. State, 370 So.2d 708, 713 (Ala.Cr.App. 1978), affirmed in pertinent part, 370 So.2d 723 (Ala. 1979); Clark v.State, 451 So.2d 368, 372 (Ala.Cr.App. 1984). To sustain any other position "would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute." Thomas v. State, 460 So.2d 207, 212
(Ala.Cr.App. 1983), affirmed, 460 So.2d 216 (Ala. 1984).
Although a robbery committed as a "mere afterthought" and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, seeBufford v. State, supra, O'Pry v. State, supra, the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State,435 So.2d 1371, 1379 (Ala.Cr.App. 1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. 547, 550, 142 So.2d 869, 871
(1962). The defendant's intent to rob the victim can be inferred where "[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events."Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App. 1983), affirmed, 460 So.2d 216 (Ala. 1984). See also Cobern v. State,273 Ala. 547, 142 So.2d 869 (1962); Crowe v. State,435 So.2d 1371 (Ala.Cr.App. 1983); Bufford v. State, 382 So.2d 1162
(Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala. 1980);Clements v. State, 370 So.2d 708 (Ala.Cr.App. 1978), affirmed in pertinent part, 370 So.2d 723 (Ala. 1979).
The question this Court must answer is whether "there was sufficient evidence presented by the State, from which the jury could infer that the appellant was guilty of the capital offense charged, beyond a reasonable doubt." Clark v. State,451 So.2d 368, 372-73 (Ala.Cr.App. 1984).
Connolly concedes that, "the capital offense of murder during the commission of a robbery may be proven, even though the property taken is taken after the victim is dead." (Appellant's Brief, p. 41). Connolly contends that there was insufficient evidence to show beyond a reasonable doubt that he had formed the intent to commit a robbery prior to Ms. Sands' death.
At trial, Connolly introduced part of Herriman's confession wherein Herriman stated that he killed the victim in anger because they were arguing and she had struck him. Nevertheless, the jury had the right to weigh Connolly's proffered version of the events against all the circumstances *Page 64 
presented by the evidence, even though Herriman was the only "eyewitness" to the crime. See Bufford, 382 So.2d at 1170. Our review convinces us that there was sufficient evidence from which the jury could have reasonably inferred that Herriman and Connolly had previously decided to rob and kill Ms. Sands and use her money and property to escape. Id.
The State's evidence shows that in late March of 1983, Connolly fled from his home in Alpena, Michigan, in order to evade prosecution on a drug charge. Jack Herriman, whom Connolly met through a friend, drove him to Mobile where Connolly and Herriman stayed with another one of Connolly's friends.
In April of 1983, Connolly met Kathy Jo Sands in a local bar. A romantic relationship developed and shortly thereafter Connolly moved into Ms. Sands' apartment. Herriman moved in also. Ms. Sands and Herriman argued and did not get along because Herriman would not get a job. Nevertheless, both Herriman and Connolly remained at Ms. Sands' apartment until early June. The two men moved out after Ms. Sands and Connolly had an argument over Connolly's seeing another woman, Stacy Marie Bruner. Ms. Sands and Connolly soon reconciled and Connolly and Herriman returned to her apartment on the evening of June 8, 1983.
The next day, June the 9th, Herriman was left alone in Ms. Sands' apartment. When she returned home from work, he strangled her with a nightgown. Herriman telephoned Connolly and told him that he "had done it." Connolly returned to Ms. Sands' apartment and helped Herriman place the body in the bathtub. When Connolly and Herriman left the apartment, they took Ms. Sands' automobile. Also taken were a gold watch, a television, an adding machine, and an "Advantage" automatic bankteller card. Connolly, Herriman, and Mrs. Bruner used the bank card to withdraw $200 from Ms. Sands' bank account. They sold or pawned the other items taken from Ms. Sands' apartment.
Five witnesses connected Connolly to the murder-robbery: Mrs. Bruner, David Ricky Mealor, Al Pennington, and even Connolly himself.
After his arrest, Connolly voluntarily, intelligently, and knowingly waived his constitutional rights and gave a lengthy statement to Mobile Police Sergeant Wilbur Williams and Mobile County District Attorney Chris Galanos. This statement was to the effect that Connolly had no knowledge that Herriman actually intended to kill Ms. Sands. Connolly stated that Herriman had threatened to kill Ms. Sands "probably three or four times," and once Herriman said "something about that he wished he could do away with her and take what she had of value and leave Mobile." However, Connolly claimed that he was "shocked" when Herriman told him that he "had done it" because Herriman "frequently threatened a lot and I never thought that he was going to do it man." When Connolly returned to Ms. Sands' apartment, Ms. Sands was dead and Herriman showed him eleven dollars, some "speed" and the credit cards he had taken from her purse. Connolly stated that, after they left Ms. Sands' apartment, Herriman returned several times that day and took a gold watch, a television, and an adding machine.
In his statement, Connolly admitted becoming involved only after Ms. Sands had already been killed. If the jury accepted Connolly's statement as the truth, Connolly was guilty of neither murder nor robbery, but only of the theft of Ms. Sands' property.
Mobile Police Captain Vincent Richardson testified that, during Herriman's trial, Connolly telephoned him and said that Herriman had planned to kill Ms. Sands.
Mrs. Bruner's testimony at trial incriminated Connolly in the murder. According to this witness, Herriman "would do anything that he [Connolly] wanted him to." Mrs. Bruner gave the following account of Connolly's participation in Ms. Sands' death. Several days before Ms. Sands' murder, Connolly told Herriman that "something needed to be done about her *Page 65 
because she was getting to know too much about his business." Two days before the murder, Connolly was trying to talk Ricky Mealor into leaving Mobile with him. Connolly told Mealor that "something big was going to be going down and that he was going to be leaving town soon" and Connolly was talking about how much he disliked Ms. Sands the way he had before. Before the murder, Connolly told Herriman that "he wanted Kathy killed. He didn't care how he did it. He just wanted it done." On the very day Ms. Sands was killed, Connolly, Herriman, and Mrs. Bruner were in Sands' apartment. Connolly told Herriman that "he thought it would be best if Jack used the nightgown to strangle Kathy with" and Herriman "didn't have any objections to it."
After Herriman killed Ms. Sands, Mrs. Bruner took Connolly to Sands' apartment. When Connolly and Herriman met Mrs. Bruner about forty-five minutes later, they arrived in Ms. Sands' car. Connolly had Sands' Advantage bank card. He knew the "code" and Mrs. Bruner helped him withdraw $200, the maximum daily amount, from Ms. Sands' account. The day after the murder Herriman and Mrs. Bruner pawned the property taken from Sands' apartment and gave the money to Connolly.
Ricky Mealor met Connolly and Herriman when they first arrived in Mobile. Mealor testified that the day before the murder Connolly "said that Kathy had been — he said that she had been getting too damn nosy in his business. He said something had to be done. Jack said, yeah, something's got to be done." Connolly responded, "When you play you pay. He said, we'll go over and get her shit." Connolly tried to get Mealor to go to Texas with him but Mealor said, "I don't have no money and I don't go nowhere broke." Connolly replied, "Don't worry about no money. He said that something big was going to come down and said that he'd have the money."
Attorney Al Pennington testified that Connolly told him that "he [Connolly] is the one who went through, rifled the purse and took the money card . . . a money machine card and whatever was taken out of her purse." Connolly also admitted that "he and Stacy Bruner discussed getting rid of Kathy Sands." Connolly told Pennington that "he sort of felt responsible for Kathy Sands being dead." Connolly stated that "Jack Herriman was a whimp [sic] and that he could pretty much get Jack to do whatever he wanted him to do."
On cross examination of Pennington, defense counsel elicited the fact that Herriman had "confessed". Pennington testified that he went to see Connolly to help his client, Herriman. He stated that the District Attorney's Office said they would "make a deal if [he] told them what [he] knew;" "They said that they would confess an error coram nobis and resentence him [Herriman] to a murder" instead of capital murder and life without parole. The State then rested its case.
The only witness for the defense was Deputy Bill Madding of the Sheriff's Department, Freestone County, Texas. After Ms. Sands' body was discovered, Herriman and Connolly fled Alabama and were apprehended in Texas where both men gave statements. Deputy Madding testified that Herriman confessed to Ms. Sands' murder: "I was in the apartment when Kathy came out or came home for lunch. . . . She took a shower. She came out of the shower and started fighting with me. She slapped me. I started getting real mad. I grabbed her nightgown, placed it around her neck and strangled her."
In light of these facts and circumstances, we find that sufficient evidence was presented to require that the question of Connolly's intent be submitted to the jury. See Bufford v.State, 382 So.2d at 1170-71.
 III
This Court finds merit in Connolly's contention that the trial court erred in failing to charge the jury on the crime of murder as a lesser included offense.
Although no written requested charge on murder was tendered, defense counsel *Page 66 
called this matter to the trial court's attention before the jury was instructed:
 "MR. DEEN [Defense Counsel]: Here is your copy. Judge, I have not submitted any lesser included offenses, but I think we're entitled to them.
"THE COURT: Yeah, I think so.
 "MR. DEEN: I mean, I don't think in this case you have to submit them in writing.
 "MR. HARRISON [Assistant District Attorney]: What will be the lesser included, either murder or robbery, and that's it?
 "MR. DEEN: Murder, robbery, theft, receiving stolen property.
"THE COURT: It would have to be theft."
After the trial court completed its oral charge, defense counsel objected to the court's failure to charge on murder:
 "MR. DEEN: * * * We also except to you not giving the charge on murder. If you believe Stacy Bruner's testimony, there was evidence that she said that the Defendant had said to Herriman, get rid of her, I don't care how you do it. But there was no discussion at that time of taking, stealing anything from her, any discussion of a robbery at that time. "Later on, this Ricky Mealor heard something about taking her stuff. But it was not in conjunction with the other statement. So, if they disregarded Mealor's testimony, the jury could — it could reasonably argue and find him guilty of murder. We think we'd be entitled to that as a lesser included offense also."
Under this Court's holding in Matkins v. State, 497 So.2d 194
(Ala.Cr.App. 1985), this issue was called to the attention of the trial court and has been properly preserved for review.
In his opening statement to the jury, defense counsel argued to the effect that Connolly had no knowledge that Herriman was actually going to kill Ms. Sands, and that he became involved only after Herriman telephoned him and told him that he had killed Ms. Sands. In his closing argument, counsel contended that Herriman killed Ms. Sands in the heat of passion and that Connolly was "not guilty of any type of capital murder or of any murder."
The trial court instructed the jury on capital murder-robbery and on the lesser included offenses of robbery in the first degree and theft in the first degree.
"[A] lesser included offense instruction should be given if 'there is any reasonable theory from the evidence which would support the position.' " Hopper v. Evans, 456 U.S. 605, 611,102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1981), quoting Fulghum v.State, 291 Ala. 71, 75, 277 So.2d 886, 890 (1973); Ex parteJulius, 455 So.2d 984, 986 (Ala. 1984), cert. denied469 U.S. 1132, 105 S.Ct. 817, 83 L.Ed.2d 809 (1985).
 "An individual accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position. Fulghum v. State, 291 Ala. 71, 277 So.2d 886 (1973). A court may properly refuse to charge on lesser included offenses only (1) when it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) when the requested charge would have a tendency to mislead or confuse the jury. Lami v. State, 43 Ala. App. 108, 180 So.2d 279 (1965). In fact, our decisions are to the effect that every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility. Burns v. State, 229 Ala. 68, 155 So. 561 (1934)." Chavers v. State, 361 So.2d 1106, 1107 (Ala. 1978).
"The accused is entitled to have the trial court charge on lesser included offenses where there is a reasonable theory from the evidence supporting defendant's position, regardless of whether the State or defendant offers the evidence." Exparte Pruitt, 457 So.2d 456, 457 (Ala. 1984).
However, a lesser included offense instruction must be given in a capital case, or *Page 67 
in any other, "only when the evidence warrants such an instruction." Evans, 456 U.S. at 611, 102 S.Ct. at 2053,72 L.Ed.2d 367 (emphasis in original). See also Ex parte Curry,471 So.2d 476, 478 (Ala. 1984) ("When, . . . the only defense is one of alibi, a defendant is not entitled to instructions on lesser included offenses."); Ex parte Julius, 455 So.2d 984,987 (Ala. 1984), cert. denied, 469 U.S. 1132, 105 S.Ct. 817,83 L.Ed.2d 809 (1985) ("Julius's reliance solely upon the defense of alibi resulted in his failure to produce any evidence warranting a charge on the lesser included offense of manslaughter in the first degree."). "[T]he appropriate test is whether there was evidence to support a finding of a lesser included offense." Ex parte Kerr, 474 So.2d 145, 146
(Ala. 1985). In a capital case, there is the intolerable and constitutionally prohibited risk of an unwarranted conviction that is created when the jury is deprived of the "third option" of convicting the defendant of a lesser included offense.Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 3159,82 L.Ed.2d 340 (1984); Beck v. Alabama, 447 U.S. 625, 637,100 S.Ct. 2382, 2389, 65 L.Ed.2d 392 (1980).
 "The Court in Beck recognized that the jury's role in the criminal process is essentially unreviewable and not always rational. The absence of a lesser included offense instruction increases the risk that the jury will convict, not because it is persuaded that the defendant is guilty of capital murder, but simply to avoid setting the defendant free. In Beck, the Court found that risk unacceptable and inconsistent with the reliability this Court has demanded in capital proceedings." Spaziano, 468 U.S. at 455, 104 S.Ct. at 3160, 82 L.Ed.2d 340.
The question in this particular case is whether there was any evidence to support a finding that Connolly was guilty of murder only. This involves the very issue discussed in Part II of this opinion — whether the theft was an "afterthought" or whether the theft was actually robbery and part of the original murder scheme. The very consideration of this question requires a finding that the jury should have been instructed on the lesser included offenses of murder as well as robbery and theft.
In this case, the jury was placed in a unique situation. Under all the evidence, including Connolly's own statement, Connolly was guilty of something. The jury's function was to decide of which crime Connolly was guilty. There was evidence that he planned a murder and robbery. However, this finding was not compelled by the evidence. The jury could also have found that Connolly planned the murder and only participated in the theft as an afterthought. The jury could have decided that Connolly's statements were true and that he had no prior knowledge of the actual murder and only participated in the theft. While the State did prove a prima facie case of murder-robbery, this is not a case where the evidence shows that the defendant is either guilty of the offense charged or innocent. Perry v. State, 455 So.2d 999, 1002
(Ala.Cr.App. 1984).
The foundation of the appellee's argument that the State proved the charge of murder-robbery is found in Ricky Mealor's testimony that Connolly said "when you play you pay" and "we'll go over and get her shit." These phrases are ambiguous and could be understood as either referring to the murder of Ms. Sands or to a murder and a robbery or theft. The error in this case is that the jury was precluded from finding whether Connolly was guilty of murder or whether he was guilty of murder and theft or whether he was guilty of murder-robbery. It is difficult to comprehend how the trial court could have charged the jury on robbery in the first degree without also charging on murder. It is confusing to consider how a jury could have found Connolly guilty of robbery without finding him guilty of murder. Under the court's instructions, if the jury believed that Connolly actually had Ms. Sands murdered, the only choice they were given was to find him guilty of robbery-murder. We consider this to be the very evil condemned in Beck v. Alabama, 447 U.S. at 637, 100 S.Ct. at 2389,65 L.Ed.2d 392: "For when the evidence unquestionably establishes *Page 68 
that the defendant is guilty of a serious, violent offense — but leaves some doubt with respect to an element that would justify conviction of a capital offense — the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction."
The judgment of the circuit court must be reversed because of the court's failure to instruct the jury on the lesser included offense of murder.
 IV
In a letter dated October 21, 1985, Connolly petitioned this Court for a writ of mandamus directing the Mobile Circuit Court to appoint "out-of-town" counsel to represent him on appeal. Connolly argues that his counsel, both at trial and on appeal, are inadequate and ineffective.
We find these allegations totally devoid of both legal and factual merit. Connolly is not entitled to counsel of his choice. Pitts v. State, 342 So.2d 40, 43 (Ala.Cr.App. 1976), cert. denied, 342 So.2d 44 (Ala. 1977); Annot., 66 A.L.R.3d 996, 1000 (1975). Under the test for determining the effectiveness of counsel announced in Strickland v. Washington, 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we find that counsel's performance both at trial and on appeal is beyond reproach.
The judgment of the circuit court is reversed and this cause is remanded for further proceedings.
REVERSED AND REMANDED.
All Judges concur.