Rel: December 16, 2022

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2022-2023

————————————————

## CR-21-0333

————————————————

## Curtis Walon Caver

### v.

## State of Alabama

## Appeal from Jefferson Circuit Court
## (CC-19-2453)

McCOOL, Judge.

Curtis Walon Caver appeals his conviction for third-degree burglary, a violation of § 13A-7-7, Ala. Code 1975. The trial court sentenced Caver to 10 years' imprisonment but suspended the sentence and placed Caver on supervised probation for two years.

<u>Facts and Procedural History</u>

In September 2018, Jerrod McCombs owned a mobile home that sat on property adjacent to the property on which his sister lives. McCombs was not living in the mobile home at that time but, instead, "was living at [his] sister's house because [he] was currently out of work" and "was also doing work on [his] home." (R. 99.) The evidence presented at trial did not indicate how long McCombs had been living with his sister, but his "stuff" was "still in [his] house." (<u>Id.</u>) While living with his sister, McCombs "had the utilities cut off at [his] property" so that he could "conserve money." (<u>Id.</u>)

On the morning of September 6, 2018, McCombs was at his sister's house when he noticed a car sitting outside the horse stables that are next to his and his sister's properties. McCombs walked onto his sister's porch and watched the driver, whom McCombs identified at trial as Caver, "sit there for about 30 minutes just kind of staring into the horse stable property." (R. 100.) When Caver left the horse stables, he stopped to ask McCombs "if there was anybody at the horse stables" because he had been "told … about a job opportunity" there. (R. 101.) McCombs told Caver that the horse stables were "not doing much business" at that time

and that he did not think the owners were hiring, and Caver said that he

would "check back later" and then drove away. (Id.) Regarding what

occurred next, McCombs testified:

"Q. Okay. And so did anything else happen that morning? And if so, how long after?

"A. Approximately anywhere from 45 minutes to an hour later I'm walking through my sister's house. And I start hearing the dogs barking towards the direction of my house.

"….

"Q. What did you do when you heard them barking?

"A. I went ahead and grabbed my pistol because I kind of had an odd experience earlier in the morning. So I walked down the field, and I see [Caver's] car setting [sic] there in my driveway. He had pulled it up far enough that you couldn't directly see it off my sister's front porch. ….

"….

"Q. What did you do when you saw [Caver's] car in front of your house?

"A. When I saw it, I immediately looked in to see if anybody was in the car, which there wasn't. I then kind of surveilled the property itself and couldn't find anybody. So then I walked up to my front steps and was at the top of my steps reaching for my door, and I looked through my window and –

3

"Q.   Okay.  I want to break that down.  When you see – when you look at your home, the window, where did that window look into?

"A.   It looks into my den.  But it's a mobile home, so it's kind of a larger window.

"Q.   And so when you looked into that window, what are you seeing?

"A.   From the steps, you're looking at the far wall of the den and my bedroom door.

"Q.   Okay.  Are you able to go into the home, or do you go into the home at that point?

"A.   At that moment, I did not.

"Q.   Okay.  And I want to ask is your house or your home, was it locked or unlocked?

"A.   It was unlocked because we live in the middle of nowhere.

"Q.   Okay.  And as you're going to open the door, what did you see?

"A.   I see [Caver] going through a box of stuff in my bedroom.

"Q.   You said a box of stuff.  Was there a bunch of stuff in boxes at this point?

"A.   Yes.  My previous job prior to that was at a cell phone repair place.  And I was in a program with Samsung, so I had, like, a lot of old cell phones and cell phone parts and different cellular gadgets kind of in boxes in there.

4

"Q.   What happened when you saw [Caver] in your bedroom going through that back [sic]?

"A.   I started to open the door.  And at that point, he heard me, and he jumped back and closed the bedroom.  So at that point, I take a few steps back from the steps so I can get to a point to where I can see if he comes out the back door or the front door.  And at that point, I called 911.

"Q.   Okay.  Did [Caver] ever come out of your house?

"A.   Yes.  After a few minutes, he walks out.  And at that point, I've already got him at gunpoint.  And he begins screaming, 'I'm not stealing anything, I'm not stealing anything.'  His words, 'I was just taking a shit.'

"....

"Q.   Can you explain to us kind of where you're positioned and where he is positioned in terms of the vehicle?

"A.   He's positioned between the vehicle and my house.  And I've kind of got myself positioned to the back corner of his vehicle.  Just in case he did have some sort of weapon, I had some sort of cover.

"Q.   And kind of after everything was over and he was taken by police, did you find anything by his vehicle?

"A.   I did.  After they towed his vehicle, I found one of my knives laying [sic] there.

"Q.   You said one of yours – where was that before it was by the vehicle?

"A.   It was in my house in my room.

"....

"Q. After this happened, … how did your home look on the inside?

"A. After doing a walk-through, [Caver] had made piles of my stuff on my bed that were – I'd say about two or three different piles laying [sic] there.

"....

"Q. When you were speaking with [Caver] kind of 45 minutes prior at your sister's house, did you ever give him permission to go into your home?

"A. No."

(R. 102-11.)

On cross-examination, McCombs conceded that his testimony was more detailed than the information he had provided during his 911 call, to the responding officer, and in his written statement. Specifically, McCombs testified that he had not previously mentioned that he had seen Caver "rifling through a box of [his] belongings" (R. 116), that "Caver saw [him]" looking through the window (R. 117), that he had found his knife where Caver's car had been sitting, or that Caver had made "piles of [his] things on [the] bed." (R. 119.)

At the close of the State's evidence, Caver moved for a judgment of acquittal, arguing that the State had not proven a prima facie case of

6

third-degree burglary. The trial court denied that motion and then proceeded with the charge conference, where the following colloquy occurred:

"THE COURT: So let's go over [Caver's] requested jury charges. …

"….

"THE COURT: [Caver's] Requested Charge No. 2, evidence has been introduced in this case for the purpose of impeaching certain witnesses and to discredit – where does that come in?

"[THE STATE]: Judge, the State's argument is that no one was impeached. There was never any impeachment done. Refreshing recollection was done but never impeachment.

"THE COURT: There was never any impeachment testimony presented at all.

"[DEFENSE COUNSEL]: Judge, if I may respond?

"THE COURT: Yes, ma'am.

"[DEFENSE COUNSEL]: A person may be impeached with what they have said before. They may also be impeached –

"THE COURT: Describe for me the circumstances in this case. I know what impeachment is. Describe for me the circumstances for which you're referencing in this case.

"[DEFENSE COUNSEL]: Yes, sir. McCombs testified today that he saw Caver rifling through a box of things in his home, and he also testified that he saw Caver make – see him.

7

And those are the things to which he did not speak when he spoke to the 911 operator, when he spoke to the responding officer, or when he wrote his written statement. So his failure to state those details and that information, that incredibly incriminating information, prior to today in court.

"THE COURT: Okay. That's not impeachment. That is where the jury can determine credibility of the witness, whether they're telling the truth or not. And I completely cover that in my credibility-of-witness statement.

"[DEFENSE COUNSEL]: Understood.

"THE COURT: So that is denied. Your exception is noted."

(R. 131-33.) Caver was subsequently convicted of third-degree burglary and thereafter filed a timely notice of appeal.

## Discussion

On appeal, Caver raises two claims that, he says, require reversal of his conviction. We address each claim in turn.[1]

### I.

Caver argues that the trial court erred by denying his motion for a judgment of acquittal. In support of that argument, Caver contends that,

---

[1]Caver's brief sets forth three claims, but the first two claims both challenge the sufficiency of the evidence. Thus, we address those two claims together.

in two respects, the State's evidence was not sufficient to sustain a conviction for third-degree burglary.

> "'"'In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v. State, 720 So. 2d 1033, 1034 (Ala. Crim. App. 1998), quoting Faircloth v. State, 471 So. 2d 485, 488 (Ala. Crim. App. 1984), aff'd, 471 So. 2d 493 (Ala. 1985). "'The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So. 2d 497, 498 (Ala. Crim. App. 1997), quoting O'Neal v. State, 602 So. 2d 462, 464 (Ala. Crim. App. 1992). "'When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State, 728 So. 2d 691, 696 (Ala. Crim. App. 1998) (quoting Ward v. State, 557 So. 2d 848, 850 (Ala. Crim. App. 1990)). "The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So. 2d 1040, 1042 (Ala. 1978).'"

Stoves v. State, 238 So. 3d 681, 690-91 (Ala. Crim. App. 2017) (quoting Wilson v. State, 142 So. 3d 732, 809 (Ala. Crim. App. 2010)).

Section 13A-7-7(a)(1), Ala. Code 1975, provides that "[a] person commits the crime of burglary in the third degree if ... [h]e or she knowingly enters or remains unlawfully in a dwelling with the intent to

9

commit a crime therein[.]" Section 13A-7-1(2), Ala. Code 1975, defines a "dwelling" as "[a] building which is used or normally used by a person for sleeping, living or lodging therein."[2]

Caver's first challenge to the sufficiency of the evidence, which he raised in his motion for a judgment of acquittal, is that the State failed to prove that McCombs's mobile home was a "dwelling." In Ryan v. State, 865 So. 2d 1239 (Ala. Crim. App. 2003), this Court discussed those structures that constitute a "dwelling" as that term is used in the burglary statutes:

> "In Foreman v. State, 546 So. 2d 977 (Ala. Crim. App. 1986), this Court noted:
>
>> "'The legislature defined "dwelling" as "[a] building which is used or normally used by a person for sleeping, living or lodging therein." Ala. Code (1975), § 13A-7-1(3). The Commentary to § 13A-7-1 states that the term dwelling "is restricted to buildings used for sleeping and living." Thus, we can only conclude that the legislature intended that the term "dwelling" be construed narrowly to encompass only those areas "normally used for sleeping, living or lodging" and not be given the

---

[2]A person also commits third-degree burglary if he or she "knowingly enters or remains unlawfully in an unoccupied building with the intent to commit a crime therein." § 13A-7-7(a)(3). In this case, however, the indictment alleged that Caver had entering a dwelling (C. 75), and the trial court charged the jury that, to convict Caver, it must find that he had entered a dwelling. (R. 169.)

> common law construction whereby outbuildings within the curtilage of the dwelling proper would be included.'

"546 So. 2d at 981. See also Woods v. State, 568 So. 2d 331, 333 (Ala. Crim. App. 1990) ('Under current law, the premises must be a "dwelling," see § 13A-7-5(a), "which is restricted to buildings used for sleeping and living." §§ 13A-7-5 through 13A-7-7, Commentary at 233 (emphasis added [in Woods]).'); and Ward v. State, 701 So. 2d 53 (Ala. Crim. App. 1996). 'Normally' is defined in Black's Law Dictionary 1059 (6th ed. 1990) as follows: '[a]s a rule; regularly; according to rule, general custom, etc.' As the Commentary to § 13A-7-1 notes, the statutory definition of a dwelling 'approximates' the Alabama common-law definition. In 3 C. Torcia, Wharton's Criminal Law § 325 (15th ed. 1995), it is stated that at common law '[a] person "lives" in a structure if he uses it regularly for the purpose of sleeping.' In R. Perkins and R. Boyce, Criminal Law, p. 259 (3d ed. 1982), the authors noted:

> "'[c]ertain it is that the dweller and his entire household may be away for months, without depriving the house of its character as his dwelling. It was ruled in the 1500's, and often repeated since, that a man may have two dwellings at the same time actually used during alternate periods and that burglary may be committed in the one not being used at the moment, – such as a winter home in the city and a summer cottage in the mountains.'

"(Footnotes omitted.) And in Ex parte Vincent, 26 Ala. 145, 152 (1855), referenced in the Commentary to § 13A-7-1, the Alabama Supreme Court stated that at common law a building could be deemed a dwelling, in a burglarious sense, if it is one in which a person 'usually or often' lodges at night. See also Moore v. State, 35 Ala. App. 95, 44 So. 2d 262 (1950) (construing T. 14, § 86, 1958 Code); and Hamilton v. State,

> 354 So. 2d 27 (Ala. Crim. App. 1977) (construing T. 14, § 86, Code of Alabama 1940 (Recomp.1958))."

Ryan, 865 So. 2d at 1242-43 (footnote omitted).

In support of his argument that the State failed to prove that McCombs's mobile home was a "dwelling," Caver points to the undisputed fact that McCombs was living with his sister at the time of the burglary, and he argues that the State did not present any evidence indicating that McCombs had ever lived in the mobile home. However, as this Court explained in Ryan, the fact that McCombs was not living in the mobile home at the time of the burglary does not in and of itself "depriv[e] the [mobile home] of its character as his dwelling" because "a man may have two dwellings at the same time." Ryan, 865 So. 2d at 1243 (citation omitted). The question is whether McCombs regularly or normally used the mobile home for sleeping, living, or lodging, regardless of whether he was using it for those purposes at the time of the burglary. Id.

Despite Caver's argument to the contrary, the State presented evidence tending to indicate that McCombs had lived in the mobile home before moving into his sister's house and that he intended to live there again. Specifically, McCombs described the property on which the mobile home sits as the place where he "live[s]" and described the mobile home

as his "house" (R. 99), and he testified that his "stuff," including his bed, "was still in [his] house" while he was living with his sister. McCombs also testified that he was living with his sister only because he was "currently out of work" and was "doing work on [his] home," which, given that much of his personal property was still in the mobile home, suggests that the mobile home was McCombs's primary residence and that he was living with his sister only temporarily. In addition, McCombs testified that he had "cut off" the utilities in the mobile home to conserve money, which, when considered in conjunction with McCombs's other testimony, further suggests that he had been living in the mobile home with operable utilities before he moved into his sister's house.

As noted, when reviewing the sufficiency of the evidence, this Court must accord the State all legitimate inferences from the evidence, and the evidence cited above supported a legitimate inference that McCombs had been living in the mobile home before he moved into his sister's house and that he intended to live in the mobile home again when he gained employment and completed the "work" on the mobile home. Thus, according the State all legitimate inferences from the evidence, the jury could have found beyond a reasonable doubt that McCombs's mobile

13

home was a "dwelling" as that term is used in the burglary statutes, despite the fact that McCombs was not living in the mobile home at the time of the burglary. As this Court noted in <u>Ryan</u>, a person may be away from his home for an extended period, even months or years at a time, "without depriving the house of its character as his dwelling." <u>Ryan</u>, 865 So. 2d at 1243 (citation omitted). <u>See also</u> <u>Hamilton v. State</u>, 354 So. 2d 27, 30 (Ala. Crim. App. 1977) ("We cannot say that the status of [the victim's] house as a dwelling was lost by [the victim's] failure to live there for a period of a year and a half prior to the burglary. No definite period of time, however long, is the criterion. The intention to return or not to return is determinative."); and <u>Moore v. State</u>, 35 Ala. App. 95, 97, 44 So. 2d 262, 264 (1950) ("'A house is no less a dwelling house because at certain periods the occupier quits it, or quits it for a temporary purpose.'" (quoting <u>Schwabacher v. People</u>, 165 Ill. 618, 627, 46 N.E. 809, 812 (1897))).

Caver's reliance on <u>Foreman v. State</u>, 546 So. 2d 977 (Ala. Crim. App. 1986), is misplaced. In <u>Foreman</u>, this Court held that "outbuildings within the curtilage of [a] dwelling," such as the garage at issue in that case, are not part of the dwelling. <u>Foreman</u>, 546 So. 2d at 981. According

14

to Caver, McCombs's mobile home was comparable to a garage because, he says, "the State presented no evidence that McCombs regularly used [the mobile home] for anything other than storage." (Caver's brief, p. 16.) However, we have already concluded that the State's evidence supported a reasonable inference that McCombs had been living in the mobile home before he moved into his sister's house. Thus, we are unpersuaded by Caver's attempt to equate McCombs's mobile home to a garage or other structure used solely for storage.

Caver's second challenge to the sufficiency of the evidence, which he also raised in his motion for a judgment of acquittal, is that the State failed to prove that he entered McCombs's mobile home with the intent to commit a theft therein. It is well settled that the element of intent "'"'is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.'"'" Connell v. State, 7 So. 3d 1068, 1089 (Ala. Crim. App. 2008) (quoting French v. State, 687 So. 2d 202, 204 (Ala. Crim. App. 1995), quoting in turn McCord v. State, 501 So. 2d 520, 528-29 (Ala. Crim. App. 1986), quoting in turn Pumphrey v. State, 156 Ala. 103, 47 So. 156, 157 (1908)). For that reason, "'"the question of

a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve."'" Connell, 7 So. 3d at 1089 (quoting Hallford v. State, 548 So. 2d 526, 534 (Ala. Crim. App. 1988), quoting in turn Connolly v. State, 500 So. 2d 57, 63 (Ala. Crim. App. 1985)).

McCombs testified that he saw Caver "going through a box of stuff in [his] bedroom," and he testified that he found one of his knives, which he had left inside the mobile home, on the ground where Caver's car had been sitting. That testimony provided a sufficient basis upon which the jury could have found beyond a reasonable doubt that Caver entered McCombs's mobile home with the intent to commit a theft therein. See Holmes v. State, 497 So. 2d 1149, 1153 (Ala. Crim. App. 1986) (holding that there was sufficient evidence to prove that the defendant had intended to commit a theft in the victim's house because the victim had testified that "he actually saw the [defendant] in his house going through some billfolds and papers").

The State presented evidence sufficient to prove beyond a reasonable doubt that McCombs's mobile home was a "dwelling" as that term is used in the burglary statutes and that Caver entered the mobile home with the intent to commit a theft therein. Thus, the trial court did

16

not err by denying Caver's motion for a judgment of acquittal and submitting the third-degree-burglary charge to the jury.

II.

Caver argues that the trial court erred by refusing to instruct the jury on impeachment. In support of that argument, Caver notes that McCombs's testimony included several facts "that were not present when he spoke to the 911 operator, the responding officer, and when he provided a written statement." (Caver's brief, p. 22.) Thus, according to Caver, McCombs's testimony was inconsistent with his prior statements, and, as a result, the trial court should have instructed the jury on impeachment. In reviewing this claim, we are mindful that a trial court has broad discretion in formulating its jury instructions. Albarran v. State, 96 So. 3d 131, 186 (Ala. Crim. App. 2011).

It is an axiomatic principle of law that a witness's testimony may be impeached by his prior inconsistent statement, Petersen v. State, 326 So. 3d 535, 592 (Ala. Crim. App. 2019), but nothing in McCombs's testimony was expressly inconsistent with his prior statements. Instead, as Caver concedes, McCombs merely testified to facts that he had omitted from those statements.

17

In <u>Bradley v. State</u>, 501 So. 2d 1271 (Ala. Crim. App. 1986), this Court discussed the standard for determining whether a witness's testimony is "inconsistent" with his prior statement when the statement merely omitted facts that the witness included in his testimony:

> "'It is, of course, an elementary rule of evidence that prior statements may be used to impeach the credibility of a criminal defendant or an ordinary witness. But this can be done only if the judge is satisfied that the prior statements are in fact inconsistent.' <u>Grunewald v. United States</u>, 353 U.S. 391, 418, 77 S. Ct. 963, 981, 1 L. Ed. 2d 931 (1957); Annot., 40 A.L.R. Fed. 629, § 3(a) (1978). 'A prior statement of a witness, in order to be provable for the purpose of impeachment, must be contradictory of or inconsistent with his testimony.' <u>Lester v. Jacobs</u>, 212 Ala. 614, 617, 103 So. 682 (1925). See also <u>Helton v. Alabama Midland R. Co.</u>, 97 Ala. 275, 12 So. 276, 284 (1893); <u>Morris v. State</u>, 25 Ala. App. 175, 177-78, 142 So. 685 (1932). ….
>
> "'A witness may be impeached by a prior statement from which there was an omission of something important which would be natural to mention in the framework of that statement and which was testified to by the witness at the trial. <u>But a prior statement is not inconsistent merely because it is not as complete as the testimony of the witness at trial</u>.' 81 Am. Jur. 2d <u>Witnesses</u> § 597 (1976). 'Whether such inconsistency actually exists should be determined not from single or isolated answers, but from the testimony of the witness as a whole; and the question of contradiction is whether or not the proffered statement and the testimony of the witness lead to <u>inconsistent conclusions</u>, indicating that the differing expressions of the witness appear to have been based on <u>incompatible beliefs</u>.' 98 C.J.S. <u>Witnesses</u> § 583 (1957)."

18

Bradley, 501 So. 2d at 1272-73 (emphasis added).

In arguing for an impeachment instruction, defense counsel cited two facts in McCombs's testimony that had been omitted from his prior statements: that McCombs had seen Caver "rifling through a box of [his] belongings" and that Caver had seen McCombs looking at him through a window.[3]

As to McCombs's testimony that he had seen Caver "rifling through a box of [his] belongings," that fact was relevant because it tended to prove Caver's intent to commit a theft. However, whether McCombs's omission of that fact from his prior statements gave rise to an inconsistency hinged on whether his testimony and the statements "lead to inconsistent conclusions" or demonstrate that McCombs held "incompatible beliefs." Bradley, 501 So. 2d at 1273 (citation omitted). See also Commonwealth v. Condon, 99 Mass. App. Ct. 27, 35, 162 N.E.3d

---

[3]On appeal, Caver cites two other facts in McCombs's testimony that had been omitted from his prior statements: that McCombs "had not previously mentioned piles of things on his bed" and "had told no one about finding a knife." (Caver's brief, pp. 22-23.) However, when arguing for an impeachment instruction, defense counsel did not cite those omissions, and, thus, we do not consider them in determining whether the trial court erred by refusing to give the instruction. See Campos v. State, 217 So. 3d 1, 9 (Ala. Crim. App. 2015) (noting that this Court's review is limited to the arguments presented to the trial court).

76, 83 (2020) (noting that a witness's prior statement is inconsistent with his testimony "if its implications tend in a different direction" (citation omitted)).

In his 911 call, McCombs stated that Caver had "broke[n] in[to] [his] house" (State's Exhibit 1), which indicated that Caver had entered the mobile home unlawfully. McCombs's oral statement to the responding officer is not included in the record, but McCombs testified that the officer asked him to "do a walk-through and see if anything was missing" (R. 118), which suggests that McCombs had explained that Caver had entered the mobile home unlawfully and that he was concerned that Caver had stolen something. McCombs's written statement is also not included in the record, but McCombs testified that the written statement was simply "a very short summary of the entire event" (R. 120), and there is nothing to indicate that the information in that summary was any different than the information McCombs had provided in his 911 call and to the responding officer.

Based on the record developed at trial, it appears that both McCombs's testimony and his prior statements supported the same conclusion and demonstrated compatible beliefs – namely, that Caver

20

had unlawfully entered McCombs's mobile home and had attempted to commit a theft therein. Thus, although McCombs's testimony that he had seen Caver "rifling through a box of [his] belongings" provided additional support for the conclusion that Caver had attempted to commit a theft, nothing about that testimony was inconsistent with McCombs's prior statements. See Pradia v. McCollum, No. CIV-13-385-D, May 10, 2016 (W.D. Okla. 2016) (not reported in Federal Supplement) (holding that an impeachment instruction was not required in a case where both the victim's testimony and her prior statement to the police indicated that the petitioner had robbed her, even though she had not stated in her police report that the petitioner had been armed with a gun but testified at trial that he had been armed with a gun). Compare United States v. Fonville, 422 Fed. App'x 473 (6th Cir. 2011) (not selected for publication in the Federal Reporter) (holding that the defendant's testimony and his prior statements were inconsistent because his testimony indicated that he had assaulted a prison official only because he believed the official was about to assault him, but his prior statements included no mention of an imminent assault by the official and, instead,

supported the incompatible belief that he had assaulted the official for other reasons).

As to McCombs's testimony that Caver had seen him looking through a window, that fact was not material. The issue for the jury to decide was whether Caver had unlawfully entered McCombs's mobile home with the intent to commit a crime therein. Whether Caver saw McCombs when McCombs looked through a window had no bearing on that issue. Thus, McCombs's omission of that fact from his prior statements did not give rise to an inconsistency between his testimony and the statements. See Bradley, 501 So. 2d at 1273 (noting that a witness "may be impeached by a prior statement from which there was an omission of something important" (emphasis added; citation omitted)). See also United States v. Williams, 740 F. Supp. 2d 10, 11 (D.D.C. 2010) (noting that "[a]n inconsistency may exist where the prior statement omits an important fact mentioned during testimony" (emphasis added; citation omitted)); and Devalon v. Sutton, 344 So. 3d 30, 32 (Fla. Dist. Ct. App. 2022) (noting that "a witness may be impeached by a prior inconsistent statement, including an omission in a previous out-of-court statement about which the witness testifies at trial, if it is material"

(second emphasis added; citation omitted)). Furthermore, to the extent that fact was material, its omission from McCombs's prior statements did not require an impeachment instruction for the same reason that the previously discussed omission did not require such an instruction.

Based on the foregoing, the trial court did not abuse its broad discretion by concluding that McCombs's testimony had not been impeached by his prior statements and that an impeachment instruction was therefore unnecessary. Thus, Caver is not entitled to relief on this claim.

### Conclusion

Caver has not demonstrated that any error occurred in his trial. Accordingly, the judgment of the trial court is affirmed.

AFFIRMED.

Windom, P.J., and Kellum, Cole, and Minor, JJ., concur.