Lionel Smelley was indicted by the Shelby County Grand Jury at the March Term of 1986 on three counts: (1) capital murder, or murder while committing robbery in the first degree, in violation of § 13A-5-40(a)(2), Code of Alabama 1975; (2) murder in violation of § 13A-6-2(a)(1), Code of Alabama 1975; and (3) robbery in the first degree in violation of § 13A-8-41(a)(1), Code of Alabama 1975. After a lengthy trial, from August 2 to August 8, 1988, the petit jury found the appellant "guilty of the offense of capital murder . . . having found that said Defendant committed an intentional murder during the course of committing the first-degree robbery as charged in the Indictment." (R. 1331.)
Immediately following the verdict, a sentencing hearing was held, whereby the mitigating and aggravating circumstances were argued by both the defense counsel and the district attorneys.
Upon conclusion of this evidence, the jury retired. Upon reconvening, the jury recommended "that the defendant, Lionel Green, be punished by death, and the vote [was] as follows: ten for death and two for life without parole." (R. 1384.)
On December 19, 1988, a hearing was held before the trial judge to pronounce sentence upon this appellant. Again, mitigating and aggravating circumstances were presented. Upon allocution, the defense counsel asked that the appellant not be sentenced to death by electrocution.
The trial judge, after considering both mitigating and aggravating circumstances and all of the evidence presented in behalf of and against this appellant, sentenced the appellant to life imprisonment without the possibility of parole. (Supp.R. 0015.)
Ricky Junkins, the son of the deceased, Bill Junkins, testified that, on February 19, 1986, he went to his father's farm in Shelby County, Alabama. Ricky stated that he had been unable to reach his father by telephone. He stated that his father lived in a small house next to his horse barn.
Ricky testified that, when he drove up to the house, several people were working in and around the barn, but all of the folks told him that they had not seen his father. Ricky then walked to the house and knocked on the door. He stepped inside, *Page 76 
saw the place "was messy," and called out his father's name. He saw blood splattered on the wall next to the bed and saw that the mattress to the bed was moved off of the box springs.
Ricky stated that he walked over to the bed, moved the mattress and saw his father lying on the floor. He reached down to touch his father and felt that he was cold. He then went outside and called the sheriff's department, since the telephone cord inside was pulled from the wall.
Ricky said that he last saw his father alive on the morning of February 18, 1986. He stated that his father wore several pieces of jewelry. He also said that his father kept several weapons in his home. All of these guns were returned to Ricky except a .22 caliber and a .38 caliber handgun.
Deputy Gene Hamby of the Shelby County Sheriff's Department was the first law enforcement officer to arrive on the scene. He stated that he walked into the house, spotted the body and secured the scene.
Officer Jesse Payne of the Calera Police Department testified that he was a licensed emergency medical technician. He stated that he arrived on the scene shortly after Deputy Hamby. He checked the victim for vital signs and determined him to be dead.
Investigator Tom Smitherman of the Shelby County Sheriff's Department participated in canvassing the scene and was the primary investigator in this case. On February 24, 1986, Investigator T. Smitherman received a call from personnel at the Southern Ready-Mix plant in Calera, Alabama, regarding certain items found floating in the gravel pit adjoining the Junkins property. Investigator T. Smitherman went to the plant and spoke with Michael Morrison. Morrison found a lamp floating in the water and he found a blanket, a sheet, a towel and a ball cap near the bank of the pit. He fished these items out of the pond and turned them over to Investigator T. Smitherman.
Investigator T. Smitherman testified that the pit was approximately 1.5 miles from the Junkins farm house. He estimated that the distance would be about the same from the pit to the house in which the appellant resided on February 18, 1986. Investigator T. Smitherman further testified that he interviewed Lewis McNeal, the appellant's neighbor and the State's key witness, on three separate occasions.
Investigator Michael Smitherman, an evidence technician with the Shelby County Sheriff's Department, was in charge of processing the scene. He stated that, on February 19, 1986, several people from the State Department of Forensic Sciences assisted him in processing the scene. He stated that after processing the scene he placed a padlock on the only door to the house and that he was the only person who had a key to the lock. He also stated that he visited the crime scene on several occasions to further process the scene. He testified that two bullet holes were found in the southwest wall of the house and in the ceiling, respectively.
Sergeant Richard Fox of the Shelby County Sheriff's Department testified that he assisted in processing the scene. He stated that he spotted the bullet hole in the ceiling. He crawled into the attic and found a slug buried in the insulation. He also stated that a slug was taken from the hole in the wall.
Wayne R. Stewart III, a medical examiner investigator for the State Department of Forensic Sciences, transported the body from the scene to the Cooper Green Hospital morgue. He assisted Dr. Joseph Embry in performing the autopsy. Stewart testified that the body had two gunshot wounds in the abdomen area and trauma on and about the head.
Larry Huys, a serologist with the State Department of Forensic Sciences, tested the blood of the victim and the appellant. Both men had ABO Type A blood. Several items found in and around the farm house were found to contain this type of blood.
Steve Drexler, a criminal trace evidence examiner with the Department of Forensic Sciences, recovered several hairs from the victim's clothing which were consistent with Negro hairs. However, the hairs found lacked sufficient characteristics to *Page 77 
make a meaningful comparison to the appellant's hair.
Lauden Yates, the lab director for the Department of Forensic Sciences, testified that he specialized in firearms and tool marks identification. A piece of metal and a spring were found under the victim's body. Yates identified these items to be part of an extractor rod housing from a Colt Pacemaker .22 caliber single-action revolver. He also identified another piece of metal which was found near the victim's body as being part of a pistol grip mechanism from the same type weapon.
Yates testified that four spent projectiles (or bullets which have previously been fired) were turned over to him. Two were recovered from the victim's body by Dr. Embry, one was removed from the wall, and one from the ceiling of the farm house. He identified all four as being .22 caliber long rifle ammunition. Yates further testified that the grooving on the projectiles was consistent with a Colt Pacemaker pistol.
Yates also examined a bedspread and two bed sheets turned over to him. The bedspread had a bullet hole with stippling (or a scattering of gun powder) around the hole. One of the sheets had three bullet holes in it with stippling around the holes. Yates testified that it was possible that the three holes were made by one gunshot, by the sheet being folded. The other sheet had two bullet holes in it; one hole had stippling around it.
Yates testified that the stippling was consistent with a gun being fired at close range. He also stated that all the holes were consistent with a .22 caliber bullet.
Dr. Joseph Embry, a forensic pathologist with the Department of Forensic Sciences, testified next for the State. Dr. Embry performed an autopsy on the victim on February 19, 1986. He stated that one bullet was lodged in the victim's stomach and one in his chest wall. The gunshot wound to the stomach was surrounded with stippling, which indicates that the shot was fired from within one to two feet.
Dr. Embry also stated that the victim suffered numerous injuries on and about his head, as follows:
 "He had a great number of bruises and tears of his scalp in the right temple area and the upper portion of his right cheek in an arc about eight-by-four inches extending into the scalp behind the right ear from the upper portion of the right cheek. He had similar tears in the right ear and the back of the left side of his head. These tears were patterned injuries in that they were curved and must have been about a half-inch in length.
 "The skull beneath the tears above his right ear were shattered and small pieces of skull and brain were in his hair.
 "He had other scrapes and abrasions or bruises or contusions on the tip of his nose in the location of the eyeglass and the back of his right arm."
(R. 956-57.) And he stated:
 "On his brain on the right side he had tears, but beneath the tears in his scalp and fractures in his skull, superficially to the brain itself. He had marked hemorrhage or bleeding in the abdomen in the area around the interior vena cava in the back of his abdomen.
 "Externally, he had scrapes and bruises on the right side of his arm on the outside aspect and on the back of his right elbow, the back of his right forearm, and the back of his right upper arm. The elbow had lacerations or tearing of the upper arm just above the elbow. He had a few scrapes on the inside aspect of his right forearm in the mid portion, and he had a scrape on the front of his right forearm.
 "He had scrapes on the back of his hands and wrists, including the right thumb, middle finger, ring finger, and the left middle finger and the fifth finger.
 "He had a one-inch bruise in the right upper chest, in this area (indicating). He had three bruises over his back over his shoulder blade that appeared to be patterned bruises. They were diagonal in orientation with the upper part to his right measuring up to one and one-fourth *Page 78 
inches in length. They were parallel. The upper portions appeared abraded or scraped and slightly rounded."
(R. 961-63.)
Dr. Embry further testified that Bill Junkins died as a result of a gunshot wound to the abdomen, with the injuries to the head contributing to his death. (R. 961, 995.)
Lewis McNeal testified that, on February 18, 1986, the appellant was living with his foster mother in the home next to his (McNeal's) home. McNeal stated that, on this date, he came home from work and saw the appellant standing in the yard with two other men drinking wine. McNeal stated that the appellant asked him for $2.00. When he refused to give the appellant any money, the appellant responded, "By dark I'll have some money." (R. 1007.)
Later in the night of February 18, 1986, after McNeal had gone to bed, the appellant knocked on his door. McNeal stated that the appellant asked him to take him (the appellant) to the bus station. McNeal stated that he took his girl friend's car and stopped on the way to buy gas. He stated that the appellant gave him a $50.00 bill to pay for the gas. McNeal admitted that he kept the change.
The two left there and went to John Booker's house to buy a shirt for the appellant and some marijuana. They left Booker's house and went to Shelby Motor Lodge in Alabaster, Alabama. McNeal registered and got a room, paying with the change from the $50.00. He stated that the appellant took a shower and changed clothes. When the appellant came out of the bathroom, he noticed that the appellant had a gunshot wound to his side.
From there, they drove toward Birmingham, Alabama, stopping in Hoover, Alabama, to buy some beer. McNeal testified that, while on the interstate, the appellant started throwing clothes out of the car.
When they arrived at the Greyhound bus station in Birmingham, the appellant asked the clerk which bus was leaving next. The clerk said Miami, so the appellant bought a bus ticket.
While waiting on the bus, the appellant told McNeal what happened.
"A. . . .
 "We got in the car and I asked him again what was going on and he told me, 'I fucked him up.' And I said, 'Who? Man, did you kill somebody?' And he said, 'Yes,' just like that. And so he got to telling me about it.
"Q What did he tell you?
 "A He told me he walked over there and he said he knocked on the door and he said that Bill opened the door and he said, 'Bill, give me my damn money.' And he said that Bill said, 'I don't owe you no money.'
 "He said it looked like he was reaching for something and he jumped him. He said they got to tussling and said the pistol went off and hit him in the side. And then he said to Bill, 'Motherfucker, you done shot me.' And they kept on tussling and he said that he took the pistol from him and then he backed up from him.
 "And Bill said, 'Please, son, don't kill me.' And he said, 'Motherfucker, I told you I was going to kill you,' and that's when he said, 'I shot him and beat him.' "
(R. 1017.) McNeal also testified that he saw the appellant with a roll of money, that the appellant offered to pay him $1,300.00 and that the appellant told him he had $25,000.00, which he took from Bill.
Carla Hundley, a court reporter for the eighteenth judicial circuit of Alabama, testified that, on April 22, 1986, she recorded and transcribed the testimony of the appellant at a hearing on the same date. She read a part of that proceeding to the jury.
In summary, the transcript revealed that the appellant admitted going to Miami, Florida, on February 18, 1986. He claimed that he killed Bill Junkins when they fought, but only after Bill shot him in the side.
The transcript revealed that the appellant went to Bill's house to ask for some money ($250.00) that he claimed Bill owed him. He said that Bill responded, "I'm tired of you niggers coming over here and *Page 79 
asking me about . . . some damn money I owe you." (R. 1055.)
According to the appellant, Bill told him to get out or he would shoot him. The appellant replied, "Bill, you don't want to do that." (R. 1055.) At that time, the appellant stated, Bill shot him with a .22 pistol.
The appellant then claimed that he and Bill began to struggle over the gun, and during this altercation the gun went off two more times. Eventually, he got the gun from Bill and started hitting him in the head with the gun about fifteen times. The appellant also stated that, after Bill stopped fighting, he hit him once more in the head.
The appellant admitted that he took a few thousand dollars from Bill's wallet, which was on the dresser by the bed, and he took two gold rings from Bill's hand. The appellant also stated that he took the .22 pistol that was used in the struggle and several other items on which he feared his fingerprints might be found, including a blanket, some sheets and a lamp. He threw most of these items in the gravel pit at Southern Ready-Mix.
The appellant further stated that he paid McNeal $1,250.00 and gave him the two gold rings for taking him to the bus station. He said that they stopped at a motel so he could take a bath, and they stopped to buy some marijuana before going to the bus station.
Chief Deputy James Jones of the Shelby County Sheriff's Department was the last person to testify for the State. He stated that he went to Miami, Florida, arrested the appellant, and transported him back to Alabama.
The appellant recalled Investigator T. Smitherman, who questioned McNeal on three occasions: informally on March 5, 1986, and then formally on April 22 and May 5, 1986. Smitherman stated that McNeal's statement varied on the different occasions in three respects: (1) that he and the appellant stopped at John Booker's; (2) that he and the appellant stopped at the motel; and (3) that he took $400.00 from the appellant.
Sergeant Richard Fox was also recalled by the appellant. Fox stated that he was present when McNeal was interviewed on April 22 and May 5, 1986. He recalled that McNeal said that he kept the change from $20.00 given to him for gas by the appellant, and he took $400.00 the appellant gave him for taking him to the bus station.
Lastly, the appellant testified in his own behalf. He testified that he did general labor for Bill Junkins as late as January of 1986. He stated that, on February 18, 1986, he was standing around with some other men. According to the appellant, he and three other men split two pints of MD 20/20 wine.
The appellant then stated that he left his foster mother's house and walked down the railroad tracks to Bill Junkins' house. Upon arriving, he knocked on the door and asked Bill for the money he claims Bill owed him. The remainder of the appellant's testimony was substantially the same as the transcript read by Carla Hundley as set out above.
 I
The appellant's primary contention on appeal is that his "motion to dismiss" prior to trial should have been granted because he was denied his right to a speedy trial.
Because of the lengthy delay (over twenty-eight months), the relevant occurrences are set out below:
February 18, 1986 Bill Junkins was killed at his home in Shelby County, Alabama.
March 21, 1986 A Shelby County grand jury returned an indictment against this appellant for capital murder.
March 24, 1986 A warrant was issued for the appellant's arrest.
March 25, 1986 The appellant was arrested and extradited from the Dade County, Florida, jail, where he was being held, back to Shelby County, Alabama.
April 7, 1986 The appellant, after being found indigent, was appointed counsel, Richard Bell.
April 8, 1986 Application for Youthful Offender status filed by the appellant; trial *Page 80 
judge ordered an investigation and set the hearing for June 17, 1986.
April 15, 1986 The appellant filed numerous discovery motions.
April 16, 1986 The appellant filed a writ of habeas corpus for setting of bail; trial judge set a hearing for April 18, 1986.
April 18, 1986 Above hearing continued until April 22, 1986, by request of defense counsel.
April 22, 1986 First habeas corpus hearing held.
April 28, 1986 Trial judge set bail at $150,000.00.
May 7, 1986 The appellant filed a motion to hire a private investigator.
May 8, 1986 Hearing on above matter set for May 23, 1986.
May 20, 1986 The appellant filed a motion to reduce bond, or, in the alternative, a motion for speedy trial; and he filed a motion to hire psychiatric experts.
June 17, 1986 Judge Rabren denied Youthful Offender status to the appellant; the appellant pleaded not guilty and not guilty by reason of insanity or mental defect.
July 15, 1986 By motion of the appellant, all motions pending were set for hearing on August 12, 1986.
July 29, 1986 Defense counsel sent a letter to the trial judge asking to have the pre-trial hearing on August 11, 1986, continued until a later date.
August 11, 1986 Pre-trial hearing continued to August 25, 1986.
August 12, 1986 By motion of the appellant, the motions hearing was continued until September 16, 1986.
August 25, 1986 Pre-trial hearing continued until October 13, 1986.
September 16, 1986 The appellant's motions: to hire a private investigator — Denied; to hire a psychiatric expert — Denied; for discovery — Granted.
October 2, 1986 Order for psychological examination set for October 28, 1986.
October 13, 1986 Trial continued until first criminal docket in 1987 by Judge Rabren.
November 25, 1986 Lunacy report completed by Department of Mental Health and Mental Retardation.
November 26, 1986 Letter sent from Department of Mental Health to Shelby County Clerk's office, notifying court of completion of report. (Filed in clerk's office: December 10, 1986.)
December 10, 1986 Report from Taylor Hardin Secure Medical Facility filed in clerk's office.
January 26, 1987 Case set for trial on April 20, 1987.
January 28, 1987 Letter from defense counsel to the Community Court Liaison in Tuscaloosa, regarding necessity of mental health report; letter from defense counsel to D.A., seeking items asked for in discovery and apprising him of the absence of the report.
April 1, 1987 Letter from defense counsel to the assistant D.A., requesting he be provided with Brady material asked for in discovery motions.
April 2, 1987 Case continued from April 20 docket. Case to be set specially.
May 6, 1987 Letter from defense counsel to D.A. seeking requested Brady material or be faced with a Rule Nisi.
June 10, 1987 Motion by D.A. to transfer the appellant to Kilby Correctional Facility for safekeeping.
July 8, 1987 Motion for dismissal filed by the appellant pro se.
August 11, 1987 Motion to Dismiss — Denied; by agreement of the parties, case for trial on September 28, 1987; filing of withdrawal of consent filed by the appellant, because of the D.A.'s failure to provide requested discovery material; request for hearing on psychiatric experts by the appellant.
August 12, 1987 Case set specially for September 28, 1987.
August 14, 1987 Response by D.A. to the appellant's motion to dismiss; motion to restrain the appellant at trial filed by D.A. because of alleged threats to the trial judge.
August 24, 1987 Motion to recuse the trial judge and response to D.A.'s motion to *Page 81 
restrain by the appellant; motion for psychiatric expert by the appellant.
 Petition for writ of habeas corpus by the appellant because of lengthy trial delay — hearing set for August 26, 1987.
August 26, 1987 Motion for protective order filed by the Department of Human Resources — Granted; D.A.'s response to request for psychiatric experts and writ of habeas corpus.
 Finding by Judge Rabren that the appellant was not denied his right to speedy trial.
Case set for trial on November 2, 1987, at request of D.A.
September 8, 1987 The appellant's motions:
for psychiatric expert — denied; for contempt against D.A. — moot. (The appellant received a copy of the Lunacy report at the hearing on this date.); to dismiss — denied.
The D.A.'s motion to restrain the appellant — Granted.
September 28, 1987 Notice of appeal filed by appellant on denial of habeas corpus relief.
October 22, 1987 Upon the appellant's insistence (regarding conversation with presiding judge of Court of Criminal Appeals), trial was postponed pending outcome of appeal.
March 22, 1988 Motion by D.A. to transfer the appellant to Kilby — Granted.
March 29, 1988 Letter from the appellant, personally, to Judge Rochester, complaining of lengthy incarceration.
April 11, 1988 Letter from defense counsel to trial judge urging that case be set for trial immediately.
April 14, 1988 Trial judge's denial of habeas corpus relief affirmed, without opinion, by the Court of Criminal Appeals.
April 21, 1988 Motion for speedy trial by the appellant.
May 2, 1988 Application for writ of habeas corpus by the appellant pro se.
May 16, 1988 Motion for civil action and letter to Judge Rochester by the appellant pro se.
May 20, 1988 Motion for speedy trial — granted; Application for writ of habeas corpus — continued until June 24, 1988.
May 23 and June 22, 1988 Trial judge ordered to have the appellant transferred to Kilby.
June 24, 1988 Hearing on the appellant's pro se application for writ of habeas corpus continued to July 22, 1988.
July 21, 1988 Motion for Discovery by D.A.
July 22, 1988 Appellant's application for writ of habeas corpus and the D.A.'s motion for discovery continued until date of trial, August 1, 1988.
July 27, 1988 Motion to continue filed by defense counsel because of personal physical problems; trial judge took under advisement and later denied.
August 2-8, 1988 Trial conducted.
August 8, 1988 Jury returned a guilty verdict of capital murder and recommended the death penalty. Pre-sentence investigation ordered by Judge Rochester. Cause set for sentencing on December 19, 1988.
December 19, 1988 Trial judge sentenced the appellant to life imprisonment without possibility of parole.
January 27, 1989 The appellant appointed new counsel for purposes of appeal.
January 30, 1989 Notice of appeal filed by the appellant.
The United States Supreme Court set out four factors which must be weighed when reviewing a challenge of one's right to a speedy trial. Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182,33 L.Ed.2d 101 (1972). These factors are: (A) length of delay; (B) reason for the delay; (C) the appellant's assertion of that right; and (D) prejudice to the appellant because of the delay.Barker, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. Each of these will be addressed separately.
 A Length of delay. Before a reviewing court needs to inquire into the other three factors, a determination must be made as to whether the delay is "presumptively prejudicial." "[T]he length of delay *Page 82 
that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." Barker,407 U.S. at 530-31, 92 S.Ct. at 2192, 33 L.Ed.2d at 117; Wilson v. State,407 So.2d 584 (Ala.Cr.App. 1981); Watson v. State,389 So.2d 961 (Ala.Cr.App. 1980). "Little can be said on when a delay becomes presumptively improper, for the determination necessarily depends on the facts of the particular case."United States v. Eight Thousand Eight Hundred and Fifty Dollarsin United States Currency, 461 U.S. 555, 565, 103 S.Ct. 2005,2012, 76 L.Ed.2d 143, 152 (1983).
To calculate the period of time that a trial has been pending (or delayed), the starting date must be ascertained. This court has previously held that the time of incarceration or the time of indictment or information is the "triggering" date.Hayes v. State, 487 So.2d 987, 991 (Ala.Cr.App. 1986).
In the case sub judice, the appellant was indicted on March 21, 1986, and arrested on March 25, 1986. The earlier of these two dates is, of course, March 21. A trial in this matter was held on August 2, 1988; thus the "length of delay" exceeded twenty-eight months.
The issue is whether the delay of twenty-eight months is sufficient to "trigger" our inquiry of the remainingBarker factors. In Wade v. State, 381 So.2d 1057, 1059
(Ala.Cr.App.), cert. denied, 381 So.2d 1062 (Ala. 1980), we found that a twenty-one month delay in an assault and battery case "provide[d] a sufficient springboard for inquiry into the other factors." Wade, quoting United States v. Edwards,577 F.2d 883, 888 (5th Cir. 1978).
In Wade, the crux of our holding was the "lack of complexity of factual and legal issues." This court further found that this lengthy delay was a factor to weigh against the State but was not presumptively prejudicial. Wade.
In the case at bar, the appellant was charged with and convicted of capital murder. Obviously, the factual and legal issues which surround this type of case are far more complicated than the average assault and battery as inWade. Nonetheless, while refusing to find that the twenty-eight month delay was necessarily "presumptively prejudicial," we choose to address the remaining factors.
 B Reason for delay. The State has an affirmative duty to try an accused within a reasonable time. Taylor v. State,429 So.2d 1172, 1174 (Ala.Cr.App.), cert. denied, 429 So.2d 1172 (Ala. 1973), cert. denied, 464 U.S. 950, 104 S.Ct. 366,78 L.Ed.2d 326 (1983). See Barker, 407 U.S. at 527, 92 S.Ct. at 2190;United States v. Mann, 291 F. Supp. 268, 271 (S.D.N.Y. 1968) (society has a particular interest to see that its representatives make "steady efforts" for "swift prosecutions"). Furthermore, the burden of justifying the delay rests with the State. Hayes, 487 So.2d at 992.
With this in mind, we must first determine what caused the delays. In so doing, we must balance those reasons for or against the State and for or against the appellant.
The appellant was arrested on March 25, 1986, only four days after being indicted. Within two weeks of his arrest, April 7, Richard Bell was appointed to represent the appellant in this cause. On April 8, 1986, the appellant, through his counsel, filed an application for youthful offender status. An investigation was ordered and a hearing set in this matter for June 17, 1986.
On June 17, 1986, the trial judge denied youthful offender status. At this time, the appellant pleaded not guilty and not guilty by reason of insanity.
The appellant does not contend that the two-month period to make this determination was unreasonable. In Cruse v. State,489 So.2d 694, 697 (Ala.Cr.App. 1986), we stated that a transfer hearing to determine youthful status is not a "criminal prosecution" as dealt with by the Sixth Amendment, U.S. Const., and in Article one, § 6, Ala. Const. 1901. Therefore, the right to a speedy and public trial does not apply during the pendency of youthful offender status. *Page 83 See Cruse (4 1/2 years before eventual order because of appeals).
As a result, the two and one-half months from the time of indictment to the time of the denial of youthful offender status should not be weighed against the State nor in favor of the appellant.
Thereafter, a hearing on the appellant's motions and a pre-trial hearing were set for early August of 1986. At the insistence of the defense counsel, the hearings were moved to September 16 and again to October 13, 1986. The apparent reason for moving these hearings was so the defense counsel could seek psychiatric evaluation and further investigate the case. In fact, in his brief the appellant accepts the blame for the delays from October through December of 1986, pending the outcome of the lunacy report on this appellant from Taylor Hardin Secure Medical Facility in Tuscaloosa, Alabama.
The report was received in the court clerk's office on December 10, 1986. On January 26, 1987, the case was set for trial on April 20, 1987. From March 25, 1986, to January 26, 1987, there is no indication that the State or the trial court acted in any way to delay the trial of this appellant.
Between January 28, 1987, and September 8, 1987, the record reveals that the defense counsel made numerous attempts to obtain a copy of the lunacy report and requested Brady
materials. On January 28, the defense counsel wrote a letter to the court liaison in Tuscaloosa, advising her that he had not received a copy of the report. On April 1, the defense counsel wrote a letter to the new district attorney, asking that he be provided with his requested Brady material. On April 2, the appellant asked to have the case continued from its April 20 setting because of the absence of the lunacy report. On May 6, 1987, the defense counsel again sent a letter to the district attorney, telling him to supply his client with the requested items or face a motion for sanctions.
On July 8, 1987, the appellant filed a pro se motion for dismissal, complaining of his incarceration without trial. This motion was heard and denied on August 11, 1987. On this same date, the parties jointly agreed to set the trial for September 26, 1987. On the same day, however, the defense counsel filed a motion to withdraw his consent, claiming he could not proceed to trial without the lunacy report or the requested Brady
material.
It was not until September 8, 1987, after the defense counsel filed a motion for contempt against the district attorney, that he received the requested information and documents. The district attorney stated that the lunacy report was misplaced in the clerk's office and that they had previously been unable to find the report.
Therefore, the nine-month period from January to September of 1987 must be weighed against the State. There is no indication that the misplacement of the report was an intentional delay on the part of the district attorney. Instead, the action appeared to be careless and negligent.
As stated in Barker, "negligence" is not to be weighed as heavily against the State as a deliberate attempt to delay the actions. Nonetheless, the State's negligence still is a factor to be weighed against it. Arnette v. State, 551 So.2d 1158
(Ala.Cr.App. 1987); Kimberly v. State, 501 So.2d 534, 537
(Ala.Cr.App. 1986); Dykes v. State, 452 So.2d 1377, 1379
(Ala.Cr.App. 1984); Wade v. State, 381 So.2d 1057, 1059
(Ala.Cr.App.), cert. denied, 381 So.2d 1062 (Ala. 1980).
The next delay occurred between September 28, 1987, and April 14, 1988. On August 24, 1987, the appellant filed a writ of habeas corpus at the trial level, claiming he was denied his right to a speedy trial. On August 26, the trial court denied the writ and found no speedy trial violation.
On September 28, 1987, the appellant appealed the denial of his writ of habeas corpus to this court. On October 22, 1987, the defense counsel asked the trial judge to continue the trial setting, pending the outcome of this appeal. The defense counsel stated that he spoke with the presiding judge of this court. According to the defense counsel, that judge told him that there was nothing wrong with proceeding *Page 84 
to trial, but that there might be some problem if this court ruled in his favor. Even though the district attorney urged that the appellant be tried, the trial court postponed the matter until this court ruled.
On March 29, 1988, the appellant sent a personal letter to the trial judge, now Judge Rochester, complaining of his lengthy incarceration. On April 11, 1988, the defense counsel also sent a letter to the trial judge urging that the case be set for trial immediately. On April 14, 1988, this court affirmed the lower court's denial of the appellant's writ of habeas corpus.
Therefore, the six and one-half month delay during the appeal process must be attributed to the appellant. As the United States Supreme Court has stated,
 "In that limited class of cases where a pretrial appeal by the defendant is appropriate [citation omitted], delays from such an appeal ordinarily will not weigh in favor of a defendant's speedy trial claims. . . .
 " 'Having sought the aid of the judicial process and realizing the deliberateness that a court employs in reaching a decision, the defendants are not now able to criticize the very process which they so frequently called upon.' United States v. Auerbach, 420 F.2d 921, 924 (CA5 1969), rehearing denied, 423 F.2d 676, cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970)."
United States v. Loud Hawk, 474 U.S. 302, 316-17,106 S.Ct. 648, 656-57, 88 L.Ed.2d 640 (1986). And as this court has stated,
 " 'Delays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker.' Walker v. State, 386 So.2d 762 (Ala.Cr.App.), writ denied, 386 So.2d 765 (Ala. 1980)."
McCallum v. State, 407 So.2d 865, 868 (Ala.Cr.App. 1981). Seealso Braden v. State, 47 Ala. App. 466, 256 So.2d 425, 426
(1971).
Within one week of this court's affirmance, the appellant filed a motion for speedy trial. On May 20, 1988, the trial court granted the motion. The appellant thereafter appeared on the June 13 docket, but by request of the district attorney, the case was continued until August 2, 1988, when the trial ultimately began.
In summary, nine months of the twenty-eight months should be attributed to the State for its failure to provide the appellant with the lunacy report and with the requestedBrady material. Equally, nine months are attributable to this appellant, six and one-half months during the pre-trial appeal process and two and one-half months to have the appellant evaluated. Two and one-half months were not attributable to either party, because, during this time the court was reviewing the appellant's youthful offender status. These combined periods account for approximately twenty-one of the twenty-eight months.
 C Assertion of the right. No question is raised that the appellant failed to assert his right to a speedy trial. He filed two motions for speedy trials, both of which were granted. He filed two writs of habeas corpus, one by the appellant pro se, alleging unreasonable delay. The appellant also filed a pro se motion to dismiss because of the lengthy delay. The defense counsel filed a motion to dismiss on the same grounds. The appellant also sent two personal letters and a pro se motion for civil suit to the trial judge complaining of the lengthy delay.
These repeated requests are important factors which weigh in favor of an accused. Wilson v. State, 407 So.2d 584, 588
(Ala.Cr.App. 1981).
 D Prejudice. In Barker, the Court listed three ways that an accused could be prejudiced by an unreasonable delay: (1) by oppressive pre-trial incarceration; (2) by anxiety and concern of having criminal charges against him which remain unresolved; and (3) by impairment of his defense. The latter is deemed to be the most serious. Barker, 407 U.S. at 532, 92 S.Ct. at 2193,33 L.Ed.2d at 118. *Page 85 
The appellant's ability to defend himself was not affected. At trial he presented only one document; besides the appellant's testifying on his own behalf, he called only two witnesses, both of whom were initially called by the State. Furthermore, the appellant pleaded not guilty and not guilty by reason of insanity. The appellant waived his insanity defense at trial.
Instead, the appellant contends that, because he was unable to make bond, he became depressed and angry for being incarcerated twenty-eight months without being tried. This period, however, was not long enough to cause substantialprejudice to warrant a reversal. See Strunk v. United States,412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973) (prolonged delay may subject incarcerated suspect to emotional stress);United States v. Herman, 576 F.2d 1139 (5th Cir. 1978) (incarceration during 22-month delay not sufficiently oppressive).
Balancing all the foregoing factors, the scales are not tipped in favor of the appellant.
A reversal is not warranted in this cause based on the above.
 II
The appellant next contends that the prosecutor's misconduct denied him a fair trial as guaranteed by the Sixth Amendment, U.S. Const., thus warranting reversal of this cause.
The appellant took the stand to testify. His counsel asked him to step down from the witness stand to demonstrate what happened in the altercation between himself and the victim, Bill Junkins. At the conclusion of the demonstration, the defense counsel advised appellant that he could retake the witness stand, and at this time the district attorney, Michael Campbell, began clapping.
The defense counsel immediately asked to be heard outside the presence of the jury, where he expressed his concern and dislike for the district attorney's action. The district attorney apologized to the trial judge and asked the judge to apologize on his behalf to the jury. He refused, however, to apologize to defense counsel.
The jury was called back in, and the trial judge apologized for the district attorney's "emotional display." (R. 1144.) The trial judge asked the defense counsel if he was satisfied with the instruction, to which he responded in the affirmative.
The appellant now argues that the defense counsel should have sought a mistrial. Further, he claims that the instruction to the jury could not have adequately cured the harm done, since the district attorney conveyed his opinion to the jury (i.e., that the appellant was lying).
The State responds that there is no adverse ruling for this court to review. We agree. The defense counsel acknowledged that he was satisfied with the trial judge's instruction.Brown v. State, 492 So.2d 661, 663 (Ala.Cr.App. 1986); Wrightv. State, 57 Ala. App. 401, 328 So.2d 650 (1976).
Moreover, the trial judge indicated that the district attorney's conduct was improper. If anything, this most likely harmed the district attorney's credibility. This instruction sufficiently cured any potential harm caused to this appellant. In fact, "[t]here is a prima facie presumption against error when a trial judge promptly charges the jury to disregard improper remarks." Peoples v. State, 510 So.2d 554, 565
(Ala.Cr.App. 1986), aff'd, 510 So.2d 574 (Ala. 1987). See alsoSoriano v. State, 527 So.2d 1367 (Ala.Cr.App. 1988); Nelson v.State, 511 So.2d 225, 242 (Ala.Cr.App. 1986), aff'd,511 So.2d 248 (Ala. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755,100 L.Ed.2d 217 (1988).
Additionally, the appellant argues that his counsel's failure to move for a mistrial constituted ineffective assistance of counsel. To prove ineffective assistance of counsel, the appellant must satisfy the two-pronged test as enunciated inStrickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674 (1984). The appellant "must show that his counsel's representation fell below an objective standard of reasonableness" and that, because of this unreasonable conduct, he was prejudiced *Page 86 
at trial. Ex parte Lawley, 512 So.2d 1370, 1372 (Ala. 1987). To prove prejudice, the appellant must show that, but for his counsel's ineffectiveness, the outcome of his trial would have been different. Lawley, 512 So.2d at 1372. See also Ex parteDaniel, 459 So.2d 948 (Ala. 1984); Ex parte Baldwin,456 So.2d 129 (Ala. 1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727,86 L.Ed.2d 300 (1985) (adopting Strickland v. Washington as law in Alabama).
In the cause sub judice, the appellant failed to prove that the trial judge would have granted a motion for mistrial, thus making the outcome different. As we stated in Hurst v. State,469 So.2d 720, 724 (Ala.Cr.App. 1985), "[a] mistrial is a drastic and extreme measure which should be granted only when the prejudicial qualities of the comment cannot be eradicated by instruction or other action by the trial court." See UnitedStates v. Newbern, 731 F.2d 744, 753-54 (11th Cir. 1984) (although prosecutor's comments error, not reversible error, since no substantial prejudice to defendant when viewing record as a whole). The trial judge's instruction in our view did eradicate the damage; thus, there is no showing that the defense counsel was ineffective.
We find no error.
 III
The appellant also contends that the State failed to prove that the murder occurred "during" a robbery. Rather, the appellant argues that, after he killed Bill Junkins, it was only as an afterthought that he decided to take the deceased's property.
The same issue was addressed in Connolly v. State,500 So.2d 57 (Ala.Cr.App. 1985), aff'd, 500 So.2d 68 (Ala. 1986). InConnolly, 500 So.2d at 62, we stated:
 "To sustain a conviction under § 13A-5-40(a)(2) for capital murder-robbery, the State must prove beyond a reasonable doubt: (1) a 'robbery in the first degree or an attempt thereof,' as defined by § 13A-8-41, (2) a 'murder' as defined by § 13A-6-2(a)(1), and (3) that the murder was committed 'during' the robbery or attempted robbery, i.e. that the murder was committed 'in the course of or in connection with the commission of, or in immediate flight from the commission of' the robbery or attempted robbery in the first degree. § 13A-5-39(2)."
See also Bufford v. State, 382 So.2d 1162, 1170 (Ala.Cr.App.),cert. denied, 382 So.2d 1175 (Ala. 1980).
It is the latter element which the appellant argues that the State failed to prove. The appellant testified that he went to Bill Junkins' home to ask for some money ($250.00) that he claims Junkins owed him. While there, the appellant claims, Junkins threatened him and then shot him, whereupon the two men began to "tussle." According to the appellant, only after he killed Bill Junkins did he decide to take his money and jewelry.
This court further stated in Connolly, 500 So.2d at 63:
 "In Bufford, this Court found that, '[t]he jury could have reasonably inferred from the circumstances of the case that the appellant decided to rob and kill the victim and to use his vehicle and money to escape.' 382 So.2d at 1170. Thus, there was sufficient evidence presented to support 'the jury's conclusion that this was not merely a killing in the heat of anger followed by a larceny of the wallet and vehicle as a mere afterthought.' 382 So.2d at 1170-71 (emphasis added).
 "As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), 'the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events.' Clements v. State, 370 So.2d 708, 713
(Ala.Cr.App. 1978), affirmed in pertinent part, 370 So.2d 723 (Ala. 1979); Clark v. State, 451 So.2d 368, 372 (Ala.Cr.App. 1984). To sustain any other position 'would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute.' Thomas v. State, *Page 87 460 So.2d 207, 212 (Ala.Cr.App. 1983), affirmed, 460 So.2d 216 (Ala. 1984)."
We have stated before that the question of an accused's intent at the time the act was committed is usually an issue for the jury to resolve. Connolly; Crowe v. State,435 So.2d 1371, 1379 (Ala.Cr.App. 1983).
 "The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. 547, 550, 142 So.2d 869, 871 (1962). The defendant's intent to rob the victim can be inferred where '[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events.' Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App. 1983), affirmed, 460 So.2d 216 (Ala. 1984). See also Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962); Crowe v. State, 435 So.2d 1371 (Ala.Cr.App. 1983); Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala. 1980); Clements v. State, 370 So.2d 708 (Ala.Cr.App. 1978), affirmed in pertinent part, 370 So.2d 723 (Ala. 1979)."
Connolly, 500 So.2d at 63.
The question then becomes whether the State offered sufficient evidence for the jury to reasonably and fairly infer that the robbery and murder, at the very least, were "part of a continuous chain of events."
Lewis McNeal testified that, when he came home on the evening of February 18, 1986, the appellant and two other men were standing in his front yard drinking wine. The appellant asked him for two dollars, assuring him that by dark he (the appellant) would have money. McNeal also testified that later that night the appellant came to his house and asked him to take him to the bus station. McNeal said that the appellant was in a rush to get out of town.
McNeal stated that the appellant offered him $1,300.00 for taking him to the bus station, and McNeal testified that the appellant told him that the appellant took $25,000.00 from Bill Junkins.
The State also offered previous testimony of the appellant. In that previous hearing, the appellant admitted that he killed the appellant by hitting him in the head "fifteen times" with the butt of a pistol. The appellant admitted that he took a few thousand dollars from the appellant's wallet, which he claims was on the dresser, two rings from Junkins' hand, and the gun which he used to kill Junkins. The appellant also said he took several items from the house on which he feared his fingerprints might be found and threw them in a nearby gravel pit.
The appellant claims that he was the only eyewitness to the crime, and, therefore, that his testimony should be given greater weight. However, as we stated in Bufford, 382 So.2d at 1170:
 "A jury is not bound by the testimony of the only eyewitness, otherwise it would be impossible to obtain a conviction where an accused is the only witness to a crime. Circumstantial evidence will support a conviction as strongly as direct evidence provided it points to the guilt of the accused. Kelsoe v. State, Ala.Cr.App., 356 So.2d 735 (1978)."
We find that the State established sufficient evidence for the petit jury to reasonably and fairly infer that the appellant robbed and killed Bill Junkins in one continuous chain of events. The question of intent was thus properly submitted to and resolved by the jury. Connolly; Bufford.
 IV
The appellant lastly contends that the court-imposed limit of $500.00 for psychiatric evaluation denied him both a fair trial and effective assistance of counsel.
The trial judge stated that his reading of the statute limited the appellant to $500.00 for additional psychiatric evaluation. The appellant agreed but told the trial judge that the psychiatrists with whom he had spoken said they would charge far more than $500.00. *Page 88 
While we agree with the appellant that the amended version of § 15-12-21(d), Code of Alabama (1975) (Supp. 1989), allows more than $500.00 for expert assistance, we do not agree that the trial judge's error denied the appellant a fair trial, nor do we find the defense counsel's agreement with this amount constituted ineffective assistance of counsel.
Section 15-12-21(d) states, in relevant part: "Counsel shall also be entitled to be reimbursed for any expenses reasonably incurred in such defense [of a capital murder case] to be approved in advance by the trial court." The previous versions of this statute allowed reimbursement up to "one-half of the allowable attorney fees" (which was $1,000.00), but it still required pre-approval by the trial judge.
After the appellant's youthful offender status was denied on June 17, 1986, he pleaded not guilty and not guilty by reason of insanity. Previously, on May 20, 1986, the appellant, through his counsel, filed a motion to hire psychiatric experts. This motion was denied on September 16, 1986.
On October 2, 1986, the trial judge ordered that the appellant submit to a psychological examination on October 28, 1986. The appellant was transferred to Taylor Hardin Secure Medical Facility. During his stay, he was examined by three licensed psychiatrists, all of whom opined that the appellant was competent to stand trial and was sane at the time he committed the offense. (Supp.R. 0040-42).
On August 24, 1987, the appellant filed another motion for a psychiatric expert. On September 5, 1987, this motion was denied, but the appellant did receive a copy of the lunacy reports.
During pre-trial hearings on August 2, 1988, the defense counsel again asked that the appellant be granted appointed psychiatric assistance. The trial judge granted the request but limited the amount to $500.00, being under the mistaken belief that this was the statutory limit.
We hold that the trial judge's error was not reversible.Ex parte Grayson, 479 So.2d 76, 79 (Ala. 1985) (evidence must be "critical" and subject to varied opinions). We have stated before that there is no constitutional guarantee for an accused to a psychiatrist of his own choosing at the public's expense.Nelson v. State, 511 So.2d 225, 237 (Ala.Cr.App. 1986), aff'd,511 So.2d 248 (Ala. 1987), cert. denied, 486 U.S. 1017,108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). The only requirement is that a defendant be provided competent psychiatric evaluation when he claims insanity to be a "significant factor at trial."Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53
(1985). See also Bailey v. State, 421 So.2d 1364, 1367
(Ala.Cr.App. 1982).
In the cause sub judice, the appellant was examined by three licensed psychiatrists, all of whom concurred separately in their results. Denial of funds for independent evaluation is not a constitutional violation. Nelson. Thus, it follows that a limitation of those funds does not constitute a deprivation of one's rights. Whittle v. State, 518 So.2d 793, 794 (Ala.Cr.App. 1987) (Ake or § 15-12-21 does not guarantee more than what the appellant was provided).
Moreover, even after the trial judge granted the extension of funds, the appellant, at the close of the evidence, advised the trial judge that he chose not to have his insanity defense presented to the jury. In this regard, we determine that the defense counsel's misunderstanding of the law did not amount to ineffective assistance of counsel. The appellant has failed to show that the outcome of the trial would have differed had more funds been made available to him. Strickland v. Washington,466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
After careful review, and for the reasons stated, the decision of the trial court is due to be, and the same is hereby, affirmed.
AFFIRMED.
All the Judges concur. *Page 89